Approved: _____  **ORIGINAL**
KEDAR S. BHATIA
Assistant United States Attorney

Before:  HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York  **20 MAG 1615**

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA   :   COMPLAINT

      - v. -   :   Violation of 21 U.S.C. § 846

MARCO SEGOVIA-LANDA,   :   COUNTY OF OFFENSE:
ALICIA NICHOLS,   :   BRONX
LEDIF PEREZ-PEREZ,   :
LISANDY JOAQUIN ORTIZ, and   :
JOSE RIVERA,   :

    Defendants.   :

- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    EMERY HALL, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

### COUNT ONE

    1. In or about February 2020, in the Southern District of New York and elsewhere, MARCO SEGOVIA-LANDA, ALICIA NICHOLS, LEDIF PEREZ-PEREZ, LISANDY JOAQUIN ORTIZ, and JOSE RIVERA, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

    2. It was a part and an object of the conspiracy that MARCO SEGOVIA-LANDA, ALICIA NICHOLS, LEDIF PEREZ-PEREZ, LISANDY JOAQUIN ORTIZ, and JOSE RIVERA, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substances that MARCO SEGOVIA-LANDA, ALICIA NICHOLS, LEDIF PEREZ-PEREZ, LISANDY JOAQUIN ORTIZ, and JOSE RIVERA, the defendants, conspired to distribute and possess with intent to distribute were: (i) 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A); and (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

4. I am a Special Agent with the DEA. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. For approximately the last two years, the DEA has been investigating an organization involved in narcotics trafficking and money laundering activities in the tristate area. As part of this investigation, in or about January 2020, law enforcement officers obtained a judicially authorized warrant to monitor the location of a particular mobile phone ("Mobile Phone-1"). Mobile Phone-1 is associated with and is believed to be used by a particular individual involved in narcotics trafficking and money laundering activities ("CC-1").

6. Based on my participation in this investigation, including my review of records and reports and my communications with other law enforcement officers, I have learned, in substance and among other things, the following:

a. On or about February 11, 2020, pursuant to the aforementioned judicially authorized warrant, law enforcement officers were remotely monitoring the location of CC-1 via the location of Mobile Phone-1. Based on that geolocation data, CC-1 traveled from in or about the Bronx, New York, to in or about Somerset, New Jersey. In Somerset, CC-1 appeared to go to a particular hotel ("Hotel-1").[1]

b. On the afternoon of February 11, 2020, law enforcement officers went to Hotel-1. Location information shows that CC-1 left the vicinity near Hotel-1 prior to law enforcement officers arriving there.

c. When they arrived, law enforcement officers reviewed the sign-in log for guests at Hotel-1. In the sign-in log, they identified a particular individual with an out-of-state driver's license, later identified as MARCO SEGOVIA-LANDA, the defendant.

d. At or about 4:30 PM, law enforcement officers observed a female, later identified as ALICIA NICHOLS, the defendant, driving a particular vehicle ("Vehicle-1") enter the Hotel-1 parking lot (the "Parking Lot"). There were no other individuals in Vehicle-1.

e. NICHOLS parked Vehicle-1 in a secluded area of the Parking Lot. Soon thereafter, law enforcement officers observed SEGOVIA-LANDA leave the hotel, and get into a vehicle ("Vehicle-2"). SEGOVIA-LANDA then drove his vehicle to a spot next to Vehicle-1 and reversed into the spot.

f. Law enforcement officers then observed SEGOVIA-LANDA exit Vehicle-2 and open a rear door of Vehicle-2. Law enforcement officers then observed the trunk of Vehicle-1, NICHOLS's car, open and later close. Vehicle-1 then drove out of the Parking Lot.

g. Law enforcement officers followed NICHOLS until she stopped at a nearby gas station. When the car stopped at the

---

[1] The technology that law enforcement officers were using to obtain location information for Mobile Phone-1 provides a vicinity for a particular mobile device, not a precise location. Location information for Mobile Phone-1 showed that CC-1 was in a particular vicinity that included Hotel-1. Based on my training and experience, and the facts set forth herein, Hotel-1 was the most likely destination for CC-1 based on the location information provided for Mobile Phone-1.

3

gas station, there were no other individuals in Vehicle-1. At the gas station, law enforcement officers approached NICHOLS. She orally consented to allowing law enforcement officers to search her vehicle and she opened the trunk of Vehicle-1 to allow law enforcement officers to search it. There, law enforcement officers found what appeared to be a quantity of narcotics in a bag (the "Vehicle-1 Narcotics").

  h. Law enforcement officers then returned to Hotel-1. There, they approached SEGOVIA-LANDA, who was still at Hotel-1. SEGOVIA-LANDA provided oral consent for the officers to search his hotel room at Hotel-1 ("Hotel Room-1"), his vehicle, *i.e.*, Vehicle-2, and his mobile phone.[2]

  i. In Hotel Room-1, searched with SEGOVIA-LANDA's consent, law enforcement officers found a large quantity of United States currency.

  j. In Vehicle-2, searched with SEGOVIA-LANDA's consent, law enforcement officers found a large suitcase containing what appeared to be narcotics (the "Suitcase Narcotics") and a cardboard box containing what appeared to be narcotics (the "Box Narcotics").

  k. Law enforcement then advised SEGOVIA-LANDA of his *Miranda* rights. SEGOVIA-LANDA waived those rights and told law enforcement, in substance and in part, that earlier in the evening, he sold a quantity of approximately 2-3 kilograms of narcotics to another individual who drove to meet him at Hotel-1. The other individual paid SEGOVIA-LANDA in cash and then drove away with the narcotics.

  7. Based on my training and experience and my participation in this investigation, including the facts set forth above regarding the timing of CC-1's movements, I believe the earlier drug transaction described by SEGOVIA-LANDA involved him selling narcotics to CC-1.

  8. Based on my participation in this investigation, including my review of records and reports and my communications with other law enforcement officers, I have learned, in substance and among other things, the following:

---

[2] Based on my conversations with other law enforcement officers, I have learned that SEGOVIA-LANDA also later provided written consent for law enforcement officers to search those areas and items.

4

   a. MARCO SEGOVIA-LANDA, the defendant, also told law enforcement officers, after waiving his *Miranda* rights, that he was scheduled to sell additional narcotics to another individual that evening, later identified as LEDIF PEREZ-PEREZ, the defendant. SEGOVIA-LANDA told law enforcement officers that the transaction was scheduled to take place at or about 8:30 PM. At or about 8:30 PM, in the presence of law enforcement, SEGOVIA-LANDA had a call with PEREZ-PEREZ. PEREZ-PEREZ indicated that he would arrive for the transaction at approximately 9:10 PM, according to the global positioning system ("GPS") he was using.

   b. At approximately 9:10 PM, SEGOVIA-LANDA received a call from PEREZ-PEREZ. During that call, which law enforcement officers heard, PEREZ-PEREZ stated, in substance and in part, that he would arrive with another vehicle, a black version of a particular model of car. PEREZ-PEREZ stated, in substance and in part, that the vehicle would come to the front of the hotel and that SEGOVIA-LANDA should get in the car and direct the driver to his own vehicle. At the direction of law enforcement officers, SEGOVIA-LANDA provided a false description of himself to PEREZ-PEREZ that matched the description of a particular undercover law enforcement officer ("UC-1").

   c. Around the same time, law enforcement officers observed two vehicles enter the Parking Lot in close proximity. In one vehicle ("Vehicle-3"), law enforcement officers observed an individual, later identified as PEREZ-PEREZ, in the driver's seat, and another individual, later identified as LISANDY JOAQUIN ORTIZ, the defendant, in the passenger seat. The other vehicle matched the description provided by PEREZ-PEREZ of a black vehicle of a particular model car ("Vehicle-4"). An individual later identified as JOSE RIVERA, the defendant, was driving Vehicle-4, and no one else was in that car.

   d. Law enforcement officers then observed Vehicle-3 and Vehicle-4 circle around the Parking Lot (which was not full). Based on my training and experience, I believe this activity is consistent with conducting counter-surveillance prior to conducting a drug transaction.

   e. As planned during the earlier call between SEGOVIA-LANDA and PEREZ-PEREZ, Vehicle-4 then drove up to the front of the hotel area. UC-1 then walked up to Vehicle-4. There, RIVERA, who was driving Vehicle-4, stated to UC-1, in substance and in part, that UC-1 should get in the car. UC-1 declined, instead indicating that his vehicle was nearby. UC-1 then walked over to Vehicle-2 (SEGOVIA-LANDA's car), which UC-1 purported to be his. RIVERA followed UC-1 in Vehicle-4. UC-1

then took the suitcase containing the Suitcase Narcotics out of the trunk of Vehicle-2. Around the time he was at Vehicle-2, UC-1 observed car headlights shining in his direction from Vehicle-3, which was occupied by PEREZ-PEREZ and JOAQUIN ORTIZ. RIVERA then spoke to UC-1, who was in the immediate vicinity of Vehicle-4. RIVERA stated to UC-1, in substance and in part, that UC-1 should not worry and that he (referring to an occupant in Vehicle-3) is the person with whom UC-1 had been talking, which I believe was a reference to PEREZ-PEREZ, who had been communicating with SEGOVIA-LANDA as described above.

f. UC-1 then heard a voice speaking over the sound system of Vehicle-4 that stated, in substance and in part, "it's me." The driver of Vehicle-3 then flashed his lights. Based on UC-1's listening to SEGOVIA-LANDA's earlier phone calls described above, the voice audible on the sound system in Vehicle-4 matched the voice of the earlier caller who was in contact with SEGOVIA-LANDA to set up the drug transaction, believed to be PEREZ-PEREZ as discussed herein.

g. Based on my conversations with UC-1 and my training and experience, I believe that PEREZ-PEREZ and JOAQUIN ORTIZ in Vehicle-3 had an ongoing cellphone call with RIVERA in Vehicle-4. I further believe that RIVERA's phone was connected to the sound system in his car, which allowed PEREZ-PEREZ and JOAQUIN ORTIZ in Vehicle-3 to hear and communicate with RIVERA in Vehicle-4 regarding the drug transaction. Because of this call, PEREZ-PEREZ and JOAQUIN ORTIZ were also able to hear and communicate with UC-1 when he was near Vehicle-4, including when UC-1 was transferring the suitcase with narcotics.

h. UC-1 then placed the suitcase of narcotics from SEGOVIA-LANDA's Vehicle-2 into Vehicle-4. Around the same time, UC-1 heard, through Vehicle-4's sound system, PEREZ-PEREZ indicate that he was going to come up to Vehicle-4. Around the same time, Vehicle-3 moved closer to Vehicle-4 and UC-1. At that point, law enforcement officers approached and placed PEREZ-PEREZ, JOAQUIN ORTIZ, and RIVERA under arrest.

9. Based on my communications with other law enforcement officers, I have learned that after LEDIF PEREZ-PEREZ, LISANDY JOAQUIN ORTIZ, and JOSE RIVERA, the defendants, were placed under arrest, law enforcement officers found a mobile phone ("Mobile Phone-2") on the center armrest area of Vehicle-3, driven by PEREZ-PEREZ and JOAQUIN ORTIZ. Law enforcement officers observed that Mobile Phone-2 had an open, ongoing phone call with another mobile phone ("Mobile Phone-3") that was in Vehicle-4, driven by RIVERA. When law enforcement

6

officers found Mobile Phone-2, it was set to "speakerphone" mode, which meant that both PEREZ-PEREZ and JOAQUIN ORTIZ could participate in the call and both could hear the caller on Mobile Phone-3, *i.e.*, RIVERA.

10. Based on my communications with other law enforcement officers, I have learned that, based on field testing, the Vehicle-1 Narcotics consist of approximately seven kilograms of substances testing positive for cocaine and seven kilograms of substances testing positive for methamphetamine; the Suitcase Narcotics consist of approximately eight kilograms of substances testing positive for fentanyl and approximately two kilograms of substances testing positive for cocaine; and the Box Narcotics consist of approximately eleven kilograms of substances testing positive for cocaine.

11. On or about February 12, 2020, another law enforcement officer and I interviewed ALICIA NICHOLS, the defendant, after she was taken into custody following the approach at the gas station described above. NICHOLS was advised of her *Miranda* rights and waived those rights. NICHOLS stated, in sum and substance, that she picked up the bag found in her vehicle (*i.e.*, the Vehicle-1 Narcotics) from another individual and that she was delivering it to a location in the Bronx, New York, in exchange for compensation.

WHEREFORE, I respectfully request that MARCO SEGOVIA-LANDA, ALICIA NICHOLS, LEDIF PEREZ-PEREZ, LISANDY JOAQUIN ORTIZ, and JOSE RIVERA, the defendants, be imprisoned or bailed, as the case may be.

_____
Special Agent Emery Hall
Drug Enforcement Administration

Sworn to before me this
12th day of February, 2020.

_____
THE HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York